**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Counsel for Plaintiff Heather Mcfarland Ribbs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER MCFARLAND RIBBS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARS PHARMACEUTICALS INC., RICHARD E. LOWENTHAL, and ERIC KARAS.<br><br>Defendants. | Case No.  '26CV4469 JO   JLB<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Heather Mcfarland Ribbs ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by her counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by ARS Pharmaceuticals Inc. ("ARS" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of ARS's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired ARS securities between March 9, 2026, and June 24, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.     Defendants provided investors with material information concerning ARS's expected timeline for expanded insurance coverage for its epinephrine nasal spray, neffy, with CVS Caremark. Defendants' statements included, among other things, confidence that this coverage would begin on July 1, 2026 and be in place for the summer and back-to-school allergy seasons.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating false and misleading statements and/or concealing material adverse facts concerning the expected timeline for the expanded insurance coverage for neffy through CVS Caremark. This caused Plaintiff and other shareholders to purchase ARS's securities at artificially inflated prices.

4.     The truth emerged on June 24, 2026, after the market closed, when ARS published a press release announcing that the Company did not receive expanded insurance coverage for neffy through CVS Caremark by the guided July 1, 2026 deadline, which meant that ARS did not have expanded insurance coverage for neffy for the summer or back-to-school allergy seasons. ARS stated that CVS Caremark reserved its decision on the expanded insurance coverage for neffy until January 2027.

5.     As a result, investors and analysts reacted immediately to ARS's revelation. The price of ARS's common stock declined from a closing market price

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of $10.54 per share on June 24, 2026 to $8.02 per share on June 25, 2025, a decline of over 23.9% in the span of just a single day.

6.    Investors have sustained significant damages as a result of Defendants' fraudulent statements. Plaintiff seeks to recover those damages by way of this lawsuit.

## JURISDICTION AND VENUE

7.    Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant ARS is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

3

of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

12. Plaintiff purchased ARS common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in ARS is attached hereto.

13. ARS Pharmaceuticals Inc. is a Delaware corporation with its principal executive offices located at 11682 El Camino Real, Suite 300, San Diego, CA 92130. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "SPRY."

14. Defendant Richard E. Lowenthal ("Lowenthal") was, at all relevant times, Co-Founder, President, Chief Executive Officer, and Director, of ARS.

15. Defendant Eric Karas ("Karas") was, at all relevant times, Chief Commercial Officer, of ARS.

16. Defendants Lowenthal and Karas are sometimes referred to herein as the "Individual Defendants." ARS together with the Individual Defendants are referred to herein as the "Defendants."

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ARS's reports to the SEC, press releases, and presentations to securities analysts, money

4

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18. ARS is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

19. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to ARS under respondeat superior and agency principles.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

A.    **Company Background**

20.    ARS is a clinical stage biopharmaceutical company focused on the development and commercialization of neffy for needle-free intranasal delivery of epinephrine for emergency treatment of Type 1 allergic reactions, including anaphylaxis.

B.    **Defendants Materially Misled Investors Concerning the Company's Commercialization of Neffy**

*March 9, 2026*

21.    On March 9, 2026, ARS published a press release announcing fourth quarter and full year 2025 results and updates on neffy commercialization. Defendant Lowenthal stated, in pertinent part:

> 2025 was an important year for ARS Pharma as we established neffy as a differentiated, scalable epinephrine treatment of choice. We have built a strong base business with initial prescriptions expected to begin renewing in 2026 as product reaches expiration. This shift towards renewals, combined with continued growth in new neffy patients, positions us to accelerate market share expansion.

> Progress with insurers has been positive over the past year and we continue to focus in 2026 on securing unrestricted access with the remaining major payors. In parallel, we are executing with discipline across commercial, regulatory, and clinical fronts by removing friction to scale adoption, generating real-world evidence to reinforce confidence in neffy, and expanding global approvals of neffy. With a strong balance sheet, shifting prescribing behavior, and a growing DTC platform accelerating patient and caregiver engagement, we believe we are building a durable franchise with meaningful long-term strategic value.

6

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

22. The same day, ARS hosted an earnings call further detailing the Company's fiscal results and commercialization guidance for neffy. Defendant Lowenthal stated, in relevant part:

Neffy is the only FDA-approved needle-free treatment for type 1 allergic reactions, including anaphylaxis. Real-world data from our neffy Experience program published in the annals of Allergy, Asthma and Immunology showed that approximately 90% of patients experiencing anaphylaxis are effectively treated with just a single dose, consistent with published results for injection-based epinephrine products. These data support neffy's profile as a safe, effective and reliable treatment, which reinforces confidence among health care providers and patients.

*     *     *

Legacy auto-injectors benefit from decades of embedded renewal behavior within physician workflows. Approximately half of these prescriptions are refills, most written electronically without an office visit. As a new entrant, neffy has relied on new prescriptions, and we have not yet reached the point where expired neffy product contributes to volume through refills. New prescriptions require office visits, education, workflow adoption and administrative time, all of which introduce friction early in the launch. These realities informed our commercial team, and we have refined our execution approach going into 2026. As part of the continued refinement of our strategy, beginning in the second quarter, we will expand our sales force and realign territories to increase engagement with our priority accounts. Importantly, this is funded through reallocation of existing commercial resources and will not increase our planned SG&A expense in 2026.

*     *     *

We are still early in building up the getneffy.com awareness. However, engagement indicators have been encouraging so far. Collectively, these efforts are intended to improve consistency and scalability over time. As we move forward into 2026, our focus remains on disciplined execution. Our priorities fall into 3 categories: access, adoption and advancement. On access, we are committed to expanding unrestricted

7

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

coverage with the remaining major PBM, CVS Caremark, where discussions are ongoing. In a high-volume category like epinephrine, prior authorization requirements can create meaningful administrative friction. Reducing that burden remains an important objective. We ended 2025 with approximately 93% overall commercial coverage, inclusive of plans that may still require prior authorization and approximately 57% of covered lives have access without prior authorization.

23.    Also as part of the earnings call, Defendant Karas stated, in pertinent part:

Turning to market access. We ended 2025 with approximately 93% commercial coverage, inclusive of plans where prior authorizations may still be required. ***We are highly focused on CVS Caremark, Anthem and the large regional payers to ensure commercial coverage without restrictions.*** We have also secured unrestricted coverage for Medicaid patients in 8 states. In other states, Medicaid coverage requires prior authorization, and we are working diligently to reduce barriers for health care providers and ensure affordability for patients in these highest volume states. Across commercial and Medicaid, we are encouraged by the ongoing discussions with payers and state-level decision-makers and look forward to sharing more information during the second quarter as those discussions progress. For plans that require prior authorization, approval rates are approximately 55%. While approvals are meaningful, the administrative burden itself can dampen prescribing momentum in a high-volume category, which is why reducing pay requirements remains a top commercial priority.

[Emphasis added].

24.    During the question-and-answer segment of the earnings call, Defendant Lowenthal responded to questions from analysts, in relevant part:

<Q: Andreas Argyrides - Oppenheimer – Analyst> Congrats on a successful year. Can you give us a little bit more color on what you're seeing on the contribution from the Get neffy program? And then also,

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

how are you thinking about timing on expanding unrestricted access? Yes, maybe a follow-up.

<A: Richard E. Lowenthal> Yes. So first on the getneffy.com. So we're seeing a little bit over 10% of our prescriptions coming through getneffy.com at this point. We believe the program is growing well. So we see the trend lines are going well, and it's starting to catch on. A lot of it is just building awareness of the program. And again, the program provides benefits to both the physicians by making it a little bit easier for them to deal with prescribing and especially if there's a prior authorization necessary and also for patients who want to get neffy and don't want to wait the long periods of time. It sometimes takes to get an appointment with an allergist to get in to get a prescription. So we think it's going to grow over time, and we're very happy with the program right now.

And the second question, just remind me, Andreas, sorry.

<Q: Andreas Argyrides> Just more on the timing of expanding the access.

<A: Richard E. Lowenthal> Yes. Well. Right. Okay*. **So we believe we'll have some confidence in our coverage very shortly in the next month. Certainly, Caremark will wait until July 1.** And then Anthem and Aetna can actually move a little bit quicker and so can Blue Cross companies if they put it on formulary, they can move a little quicker. **But Caremark has a very rigid system, so they put it on July 1**. So we believe heading into the summer, we'll have a fairly substantial expansion of our coverage. And then we're also working very heavily, Andreas, on getting additional Medicaid coverage, and we're making a lot of progress in that arena as well.

[Emphasis added].

### *May 15, 2026*

25.    On May 15, 2026, ARS published a press release announcing first quarter 2026 fiscal results and provided a corporate update. Defendant Lowenthal stated, in pertinent part:

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Building on strong commercial momentum, neffy is redefining the landscape for emergency treatment of severe allergic reactions, including anaphylaxis, as the first and only needle-free epinephrine option. With expected prescription renewals beginning to layer on top of strong new patient demand in the second half of 2026, we are well-positioned to drive meaningful market share growth. We remain focused on expanding access, deepening prescriber adoption, ensuring affordability with a point-of-sale program at retail pharmacies that will convert non-covered claims to a price of $199 for patients, and advancing our intranasal epinephrine platform into chronic spontaneous urticaria.

26.     The same day, ARS hosted an earnings call further detailing the Company's fiscal results and commercialization guidance for neffy. Defendant Lowenthal stated, in relevant part:

> **The most consequential recent development is at CVS Zinc, which covers Caremark, Aetna and Anthem. Based on feedback from CVS in late April, we submitted an updated proposal to add neffy to their commercial formularies, removing the PA requirement and targeting a July 1 effective date. This proposal is now in the final stages of the formulary approval process. Based on the anticipated time line to approval, we should be able to provide more definitive updates within the next few weeks.**
>
> This timing has been extended beyond the original expectations due to the focus of PBMs on new legislation and the ongoing FTC-related interactions. Given Caremark's coverage and the typical alignment of Aetna and other Zinc-related plans, a neffy formulary addition would meaningfully expand access for patients this summer and bring the proportion of covered lives without prior authorization in line with other epinephrine auto-injector products.

[Emphasis added].

27.     Also during the earnings call, Defendant Karas stated, in pertinent part:

> The biggest takeaway from our first full year in the market is that commercial success is driven as much by ease of prescribing as it is by

10

product differentiation. We know that the biggest way to enhance the ease of prescribing is to address prior authorization requirements. This is crucial not only because many PAs are denied, but also because the process disrupts prescribing patterns in a high-volume category with millions of prescriptions written each year.

And since many of those prescriptions are written quickly and often electronically, even small amounts of friction can disproportionately impact prescribing behavior. We have implemented additional support programs to help doctors complete prior authorizations more efficiently without disrupting their existing office workflows. By doing so, we can ensure that patients do not arrive at the pharmacy only to find that their claim has been rejected and that a PA needs to be written after their visit.

The goal is to minimize prior authorizations and simplify prescribing. We are building our commercial plans around the current view and evolution of the access environment. *As Rich noted, our CVS Caremark proposal is in the final stages of the approval process, and we expect to share more in the weeks to come*. In addition, our new retail conversion program works at the point of sale to reduce abandonment when a commercial claim is rejected. This program converts a denied claim into a cash price of $199.

\* \* \*

*For payers, we believe the CVS Caremark process is nearing completion, and we've continued to expand access through Medicaid initiatives and favorable decisions.*

[Emphasis added].

28.    The above statements in Paragraphs 21 to 27 were false and/or materially misleading. Specifically, Defendants knew or recklessly disregarded the potential timeline issues with CVS Caremark's commercial formulary addition and coverage decision related to neffy. In fact, Defendants misled and deceived investors by crafting a narrative that heading into summer, ARS would have a substantial

11

expansion of its coverage for neffy, which Defendants called a key driver of the Company's commercial growth strategy. Defendants knew or recklessly disregarded that the guidance ARS provided to investors related to the timeline for expansion of insurance coverage for neffy with CVS Caremark may be significantly shifted, impacting commercialization efforts. In particular, Defendants failed to adequately disclose the risk that the expanded insurance coverage may not be available by the July 1 deadline, thus, ARS would not have the expanded insurance coverage for neffy with CVS Caremark for the summer and back-to-school seasons.

### C.    The Truth Emerges

*June 24, 2026*

29.    On June 24, 2026, after the market closed, ARS published a press release providing an update on payer access for neffy. The press release stated, in pertinent part:

> ***Despite certain payer discussions ongoing until mid-June, based on recent feedback, no new commercial formulary additions or coverage decisions have been issued for neffy in the July 1, 2026 cycle.*** ARS Pharma intends to continue working with the remaining payers, and notes that neffy remains broadly accessible to commercially insured patients with the combination of direct coverage and a recently introduced retail cash option at a price consistent with other epinephrine products. Demand has continued to grow independent of additional coverage additions. State Medicaid coverage has expanded with Florida adding neffy to its unrestricted Medicaid formulary effective July 1, 2026.

[Emphasis added].

12

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30.    Also as part of the press release, Defendant Lowenthal stated, in relevant part:

Every day, more patients and caregivers are choosing neffy to protect against life-threatening allergic reactions. We believe the strength and trajectory of neffy provides us with a path to cash-flow breakeven next year while also allowing us to invest in what we believe is a very significant opportunity – potentially bringing the first treatment for acute flares to the millions of people living with chronic spontaneous urticaria.

31.    The aforementioned investor presentation and statements made by the Individual Defendants were misleading and in direct contrast to statements made in their previous press releases and presentations. In their previous statements, Defendants identified the expected July 1, 2026 date for expansion of insurance coverage with Caremark, touting their belief that this was a realistic deadline and referencing this insurance expansion for neffy as a key driver of the Company's commercial growth strategy.

32.    Analysts expressed surprise and concern at the Company's major insurance coverage setback. For example, William Blair published a report detailing the major setback ARS faced when the CVS contract was not completed by July 1, 2026. The report stated, in relevant part:

The announcement that neffy would not be added to CVS Caremark's formulary by the July 1 formulary update came as a negative shock given management's prior guidance towards reaching a potential agreement in time and updates suggesting positive progress on the contract. Expansion of coverage—and, specifically, addition to the formulary of CVS, which remains the only major PBM without unrestricted coverage—has been a focus of investors for months, as

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

access barriers and the need for prior authorizations remain the largest barrier to neffy adoption. The timing of this announcement is especially unfortunate as it means that neffy won't be on formulary with CVS for this year's back-to-school season, so we have lowered our estimates slightly to reflect this impact.

33.     As a result, investors and analysts reacted immediately to ARS's revelation. The price of ARS's common stock declined from a closing market price of $10.54 per share on June 24, 2026 to $8.02 per share on June 25, 2025, a decline of over 23.9% in the span of just a single day.

## D.     Post-Class Period Disclosures

### *July 7, 2026*

34.     On July 7, 2026, mere weeks after Defendants announced neffy would not be granted expanded insurance coverage through CVS Caremark for the summer 2026 season, ARS published a press release announcing a CEO succession. The press release stated, in pertinent part:

> [T]oday announced a CEO succession, in which co-founder and CEO Richard Lowenthal will no longer serve as an employee and officer of the company effective July 6, 2026. The Board has appointed Donn Casale, currently President, as CEO and Director effective July 7, 2026.

## E.     Additional Scienter Allegations

35.     During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of ARS were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-

14

public information concerning the insurance expansion process with CVS Caremark and the potential delays the Company may face during the during the aforementioned process.

36. In fact, Defendants knew or deliberately disregarded that the guidance ARS provided to investors failed to take into account that the rigidity of CVS Caremark's system may significantly delay the insurance coverage expansion for neffy. Defendants knew or deliberately disregarded these issues that gave rise to the acute risks that ultimately materialized and caused ARS to miss increased insurance coverage for both the summer and back-to-school seasons for neffy. Despite such knowledge, Defendants repeatedly conveyed a positive outlook to investors and constructed a narrative that neffy would have expanded insurance coverage through CVS Caremark by July 1, 2026, despite being hyper-focused on the timeline for formulary and routinely speaking about it publicly thereby holding themselves out to investors as having unique knowledge.

### F. Loss Causation and Economic Loss

37. During the Class Period, as detailed herein, ARS and Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ARS's common stock and operated as a fraud or deceit on Class Period purchasers of ARS's common stock by materially misleading the investing public. Later, when ARS and Defendants' prior misrepresentations and fraudulent conduct became apparent to the

15

market, the price of ARS's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of ARS's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

38.     ARS's stock price fell in response to the corrective event on June 24, 2026, as alleged *supra*. On June 24, 2026, after the market closed, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning the timeline for expanded insurance coverage for neffy with CVS Caremark.

### G.     Presumption of Reliance; Fraud-On-The-Market

39.     At all relevant times, the market for ARS's common stock was an efficient market for the following reasons, among others:

(a)     ARS's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     ARS communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c)      ARS was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)      Unexpected material news about ARS was reflected in and incorporated into the Company's stock price during the Class Period.

40.      As a result of the foregoing, the market for ARS's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in ARS's stock price. Under these circumstances, all purchasers of ARS's common stock during the Class Period suffered similar injury through their purchase of ARS's common stock at artificially inflated prices, and a presumption of reliance applies.

41.      Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## H.      No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with statements about regulatory developments and prospects while at the same time omitting acute risks undermining the validity of their statements.

43.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

44.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of ARS who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance

18

when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ARS's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ARS's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ARS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 13, 2026, there were 99.3 million shares of the Company's

common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

47.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ARS;

(c)    whether the Individual Defendants caused ARS to issue false and misleading financial statements during the Class Period;

20

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of ARS's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ARS common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ARS's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ARS's securities. Such reports, filings, releases and statements were materially false and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

55.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior manager and/or director of the Company, the Individual Defendants had knowledge of the details of ARS's internal affairs.

57.    The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As officer and/or director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

truthful information with respect to ARS's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ARS's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ARS's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

58.    During the Class Period, ARS's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ARS's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ARS's common stock was substantially lower than the prices paid by Plaintiff and the other members of the

24

Class. The market price of ARS's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about ARS's misstatements.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

63. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by ARS which had become materially false or misleading.

64. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ARS disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ARS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were each a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ARS's common stock.

65. The Individual Defendants, therefore, each acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ARS to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

26
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

66.    By reason of the above conduct, the Individual Defendants and/or ARS are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: August 5, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ Adam Apton

Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290

*Attorneys for Plaintiff Heather Mcfarland Ribbs*

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS